UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JAMES SEABROOK, on his own behalf and on
behalf of others similarly situated,

                        Plaintiff,                          24-cv-2029 (PKC)

            -against-                                       OPINION AND ORDER

CITY OF NEW YORK; LYNELLE
MAGINLEY-LIDDIE; LOUIS MOLINA;
VINCENT SCHIRALDI; CYNTHIA BRANN;
RONALD BRERERTON; and ANTHONY
MONASTERO,

                        Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.,

   Plaintiff James Seabrook was convicted of Criminal Possession of a Weapon in

the Third Degree and sentenced to an indeterminate term of 3.5 to 7 years.  At the time of his

sentencing, Seabrook had already spent over 7.5 years in the custody of the New York City

Department of Correction ("DOC").  Despite having already served more than his 7-year

maximum sentence, the state court's Sentencing and Commitment Order committed Seabrook to

the custody of the New York State Department of Correctional Services ("NYSDOCS") and

directed DOC to deliver him to state custody.  In accordance with this Sentencing and

Commitment Order, DOC detained Seabrook while it attempted to facilitate his transfer to

NYSDOCS custody.  Seabrook was ultimately held at Rikers Island for 17 days before he was

released.

   In this putative class action, Seabrook brings section 1983 claims against current

DOC Commissioner Lynelle Maginley-Liddie, former DOC Commissioner Louis Molina,

former DOC Commissioner Vincent Schiraldi, former DOC Commissioner Cynthia Brann, and

current DOC Deputy Commissioner of Security Operations Robert Brererton (the "City Commissioner Defendants"), as well as DOC Captain and current Head of the Custody Management Unit Anthony Monastero, in their individual capacities.  He alleges that the City Commissioner Defendants and Monastero deprived him of his constitutional rights under the Fourth, Eighth, and Fourteenth Amendments.  42 U.S.C. § 1983.  Seabrook also brings a municipal liability claim under section 1983 against the City of New York (the "City")..[1] Notably, only the City and officers or officials of its DOC are named as defendants and no officer or official of the state or its NYSDOCS is a party to this action.

   The City Commissioner Defendants, Monastero, and the City (collectively "defendants") move to dismiss all claims against them.  For reasons that will be explained, the Court will grant defendants' motion.

BACKGROUND

   For the purposes of defendants' motion to dismiss, the Court accepts well-pleaded allegations in Seabrook's Amended Complaint as true and draws all reasonable inferences in Seabrook's favor.  See Koch v. Christie's Intern. PLC, 699 F.3d 141, 145 (2d Cir. 2012).

   On May 6, 2016, Seabrook was arrested and charged with six crimes, including Criminal Possession of a Weapon in the Third Degree.  (ECF 19 ¶ 68.)  On April 17, 2019, the jury in Seabrook's first trial found him guilty of Criminal Possession of a Weapon in the Third Degree, but was unable to reach a verdict as to other offenses with which he was charged, including Murder in the Second Degree. [2] (Id. ¶ 69.)  At his second trial in 2022, the jury was

---

[1] The Court notes at the outset that Seabrook did not explicitly assert a separate claim for municipal liability, but rather included factual allegations in his Amended Complaint about the policies and practices of the City of New York.  The Court has generously interpreted these allegations as a claim for municipal liability under Monell v. Department of Social Services of the City of New York, 436 U.S. 659 (1978).

[2] The Sentencing and Commitment Order states that Seabrook had been charged with Murder in the Second Degree, Criminal Possession of a Weapon in the Second Degree, Criminal Possession of a Weapon in the Third Degree,

again unable to reach a verdict as to the offenses charged.  (Id. ¶ 70.)  On December 13, 2023, at

his third trial, Seabrook was acquitted of all remaining charges, including the murder charge.

(Id. ¶ 71.)

On January 31, 2024, Seabrook was sentenced in the New York Supreme Court,

New York County, Criminal Term, to an indeterminate sentence of 3.5 to 7 years for his 2019

conviction of Criminal Possession of a Weapon in the Third Degree.  (Id. ¶ 74.)  Because

Seabrook had spent over 7.5 years in DOC custody by the time of his sentencing, he had already

served more than his 7-year maximum sentence.  (Id. ¶¶ 73, 75.)  Rather than order Seabrook's

immediate release, however, the state court in its Sentencing and Commitment Order committed

him to the custody of NYSDOCS and directed DOC to deliver him to the custody of NYSDOCS.

(ECF 49-1 at 2.)  At his sentencing hearing, Seabrook's attorney stated that Seabrook "has

served the entirety of his sentence" and recognized that "his entry into [NYSDOCS] will be

merely administrative, meaning he will go in, [NYSDOCS] will process time, and he will

ultimately be released . . . It may be two days, it may be two weeks before he is processed."

(ECF 53-1 at 18-19.)  The state court similarly noted that Seabrook "is going to be released

shortly" and "is going in simply for a time calculation.  And we all know how that is going to

come out."  (Id. at 26-27.)  Seabrook's attorney also submitted an affirmation to the state court at

the time of sentencing requesting that it order NYSDOCS to not cut Seabrook's hair upon taking

custody of him.  (Id. at 19; ECF 49-3.)  In the affirmation, Seabrook's attorney stated that

Seabrook "is currently in the custody" of DOC, "has served his entire sentence," and "[h]is entry

---

Criminal Trespass in the Third Degree, and Unlawful Possession of Ammunition but was convicted of Criminal
Possession of a Weapon in the Third Degree, Criminal Trespass in the Third Degree, and Unlawful Possession of
Ammunition.  (ECF 49-1 at 2.)

into [NYSDOCS] is for the sole purpose of calculating all the jail time he served and should be immediately released."[3]  (ECF 49-3 ¶¶ 4, 5.)

The Sentencing and Commitment Order selected the following direction on the preprinted form order:

> THE SAID DEFENDANT BE AND HEREBY IS COMMITTED TO THE CUSTODY OF THE: NYS Department of Correctional Services (NYDOCS) until released in accordance with the law, and being a person sixteen (16) years or older not presently in the custody of NYSDOCS, (New York City Department of Corrections) is directed to deliver the defendant to the custody of NYSDOCS as provided in 7 NYCRR Part 103..[4]

(ECF 49-1 at 2.)

After his sentencing, Seabrook remained in de facto DOC custody at Rikers Island for 17 days before being released on February 16, 2024.  (ECF 19 ¶¶ 76-77.)  During this 17-day period, Seabrook and his counsel "notified numerous DOC officials" that he was being detained in excess of his maximum sentence.  (Id. ¶ 80.)  On February 9, Seabrook's attorney "notified a representative of DOC's Office of the General Counsel" of Seabrook's excess detainment and that he "should be released immediately."  (Id. ¶ 81.)  A "member of DOC's Office of the General Counsel" responded that Seabrook was "awaiting transfer to state custody. Once he goes upstate his time will be calculated there.  [DOC] does not calculate state sentences."  (Id. ¶ 82.)  On February 16, Seabrook's attorney wrote to "the member of the Office

---

[3] Defendants have attached the Sentencing and Commitment Order, the transcript of Seabrook's January 31 sentencing hearing, and the affirmation of Seabrook's attorney as exhibits to two declarations filed in support of their motion to dismiss.  (ECF 49-1; ECF 49-3; ECF 53-1.)  The Court takes judicial notice of these documents in resolving defendants' motion, not for the truth of the underlying statements made in the transcript and affirmation but for the fact that they were said.  See Johnson v. Pugh, 11-cv-385 (RRM) (MDG), 2013 WL 3013661, at *2 (S.D.N.Y. June 18, 2013) ("A court may take judicial notice of matters of public record, including pleadings, testimony, and decisions in prior state court adjudications, on a motion pursuant to Rule 12(b)(6)."); Simeone v. T. Marzetti Co., 21-cv-9111 (KMK), 2023 WL 2665444, at *2 (S.D.N.Y. Mar. 28, 2023) ("[C]ourts in the Second Circuit regularly take judicial notice of decisions and orders issued by other courts.").  In the case of the Sentencing and Commitment Order, it is accepted as an operative legal ruling of the state court.

[4] So in the original. The Sentencing and Commitment Order bore what appears to be the seal of the state court.  No party urges that 7 NYCRR Part 103 has any specific bearing on the claims in this action.

of the General Counsel" again and also to DOC Warden Caputo, who is not a defendant in this action. (Id. ¶ 83.) Seabrook's attorney notified DOC Warden Caputo directly that Seabrook was being detained beyond his maximum sentence and demanded his immediate release. (Id.) DOC Warden Caputo responded that same day, "copying members of the DOC Custody Management Unit, including Defendant Monastero, that members of DOC's Custody Management Unit had been working to 'expedite' [Seabrook's] transfer to State custody 'to no avail.'" (Id. ¶ 84.) Monastero also informed Seabrook's counsel on February 16 that "they were waiting for [NYSDOCS] to authorize [Seabrook's] release because 'we cannot neither release him nor transfer him to [NYSDOCS] custody without their authorization.'" (Id. ¶ 85.) Seabrook was released from DOC custody later that day. (Id. ¶ 86.)

      Seabrook filed the Amended Complaint on June 3, 2024, asserting claims on behalf of himself and others similarly situated against the City Commissioner Defendants and Monastero under section 1983 for violation of his rights under the Fourth, Eighth, and Fourteenth Amendments. Seabrook contends that his 17-day detainment by DOC in excess of his maximum sentence was unconstitutional. He also asserts a claim against the City of New York under section 1983 for municipal liability. Seabrook contends that the City of New York "has an official policy and practice of continuing the detention of persons who already have spent more time in custody prior to sentencing, as a result of the charges that culminated in the sentence, than the person's maximum term of imprisonment." (Id. ¶ 45.) He claims that "[t]he City's official policy and practice is to continue the detention of such persons until they are transferred to [NYSDOCS] custody" and that, separate from his case, this policy and practice also "includes continuing the detention of persons beyond the date on which they were entitled to conditional release." (Id. ¶¶ 46, 61.)

Defendants move to dismiss the Amended Complaint in its entirety pursuant to Rule 12(b)(6), Fed. R. Civ. P.  Defendants contend that Seabrook cannot establish a constitutional violation in light of the Sentencing and Commitment Order committing him to the custody of NYSDOCS and directing DOC to deliver him to NYSDOCS, that the City Commissioner Defendants and Monastero are entitled to qualified immunity, that Seabrook has failed to plausibly allege facts to establish that the City Commissioner Defendants and Monastero were personally involved in any alleged constitutional violation, and that Seabrook's claims are not viable under the governing law.

LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  The Court must examine only the well-pleaded factual allegations, disregarding any legal conclusions, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 678-79.  However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," dismissal is appropriate. Id. at 679.

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), "a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993)).

DISCUSSION

Personal Involvement

Section 1983 "purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights." Kalina v. Fletcher, 522 U.S. 118, 123 (1997). It is a "fundamental prerequisite" to establishing a section 1983 claim that "a plaintiff must show the defendants' personal involvement in the alleged constitutional violation." Gunn v. Annucci, 20-cv-02004 (PMH), 2021 WL 1699949, at *7 (S.D.N.Y. Apr. 29, 2021) (quoting Boley v. Durets, 687 F. App'x 40, 41 (2d Cir. 2017)). A failure "to allege that a defendant was personally involved in, or responsible for, the conduct complained of renders a complaint 'fatally defective on its face.'" Id. (quoting Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir. 1987)). In Tangreti v. Bachmann, 983 F.3d 609, 620 (2d Cir. 2020), the Second Circuit made clear following the Supreme Court's decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009) that "[t]o hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability."

Seabrook fails to allege that the City Commissioner Defendants were personally involved in the constitutional deprivations of which he complains. The City Commissioner Defendants' personal involvement is almost entirely premised on the allegation that each of them was "personally involved in the formulation and execution of the City's official policy and practice of continuing the detention of persons who already have spent more time in custody prior to their sentencings than their maximum terms of imprisonment." (ECF 19 ¶¶ 16-20.) Seabrook contends that this allegation alone is sufficient to show personal involvement based on two post-Tangreti decisions where courts in this Circuit have concluded that a policymaker can be deemed to be personally involved in a constitutional violation if the allegations can be read to

reasonably infer that the individual defendant created or maintained the policy that caused the constitutional violation to occur and acted with the requisite state of mind. See Stone #1 v. Annucci, 20-cv-1326 (RA), 2021 WL 4463033, at *8 (S.D.N.Y. Sept. 28, 2021); Myers on behalf of Estate of Myers v. Davenport, 21-cv-0922 (LEK/CFH), 2022 WL 3017367, at *5 (N.D.N.Y. July 29, 2022). But the text of the Sentencing and Commitment Order required DOC to deliver Seabrook to the custody of NYSDOCS. (ECF 49-1 at 2.) Implementation of the Sentencing and Commitment Order and delay in receiving authorization from NYSDOCS for Seabrook's acceptance into custody (or release) resulted in his continued detention at Rikers Island for 17 days between sentencing and release. The responsibility for determining whether Seabrook had in fact been in custody for seven or more years was given to NYSDOCS, not to DOC. The sentencing judge and Seabrook's defense counsel were of the view that he had served the maximum sentence of seven years, yet Seabrook was not ordered to be released immediately nor was discretion vested in DOC to release him. Because the Sentencing and Commitment Order did not authorize DOC to directly release Seabrook, he fails to allege that DOC officers and officials, including the City Commissioner Defendants, created or maintained a policy that caused his constitutional violations.[5]

In Vives v. City of New York, 524 F.3d 346, 353 (2d Cir. 2008), the Second Circuit established a framework for assessing under what circumstances a municipality can be held liable under section 1983 for creating a municipal policy when it enforces a state law. The Second Circuit observed that "[t]he word 'policy' generally implies a course of action consciously chosen from among various alternatives." Id. at 350 (quoting Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985)). It identified the "foundational question" to its liability inquiry

---

[5] The Court has its doubts that a "create or maintain" standard for supervisor liability is fully compatible with existing case law. The discussion in text merely assumes without deciding that there is such a viable standard.

as "whether a municipal policymaker has made a meaningful and conscious choice that caused a constitutional injury." Id. at 351. As later described in Juzumas v. Nassau County, New York, 33 F.4th 681, 688 (2d Cir. 2022), Vives proceeded to "set out a two-part test that looks generally to the amount of autonomy enjoyed by the municipality in effectuating the policy in question." (citing Vives, 524 F.3d at 353). "First, we ask whether the municipality had a 'meaningful choice' as to whether it would enforce the law." Juzumas, 33 F.4th at 688 (quoting Vives, 524 F.3d at 353). "If it did, then we ask whether the municipality adopted a 'discrete policy' to enforce the law that represented a 'conscious choice' by one of its policy makers." Id. (quoting Vives, 524 F.3d at 353). Only if both conditions are met can it be said that the municipality "exercises a sufficient degree of autonomy to face liability for its policy choices." Id.

When a state statute by its own terms mandates its enforcement, municipal officials who merely carry out that law will not have had a "meaningful choice" whether to do so. Vives, 524 F.3d at 353. In Vives, the Second Circuit remanded for further fact-finding on the issue of whether the municipality had a "meaningful choice" as to whether it would enforce the statute that the plaintiff was arrested and detained for violating allegedly in contravention of his constitutional rights. Id. at 354-56. Nonetheless, the Second Circuit "cautioned that the statute in question did 'not constitute such a mandate because it simply defines an offense without directing municipal officials to take any steps to act when the statute is violated.'" Juzumas, 33 F.4th at 688 (quoting Vives, 524 F.3d at 354). In contrast, in Juzumas the statute in question "direct[ed] that long guns 'shall be removed and declared a nuisance' in the event that they are not surrendered upon the suspension or revocation of a pistol license." Id. The municipality had adopted a policy pursuant to which it required the plaintiff, whose pistol license had been revoked, to surrender his long guns, allegedly in violation of his constitutional rights.

Id. at 684-85.  Noting that "[t]he language following 'shall' in a statute is 'mandatory, not precatory,'" the Second Circuit concluded based on this "mandatory language" that the municipality had no "meaningful choice" as to whether it would enforce the at-issue statute.  See id. at 688-89 (quoting Mach Mining, LLC v. EEOC, 575 U.S. 480, 486 (2015)).  It added that in requiring surrender the municipality "was reasonably applying state law, not crafting its own independent firearm surrender policy untethered to the Penal Law" and that the plaintiff's "dispute rests with the state law, whose constitutionality he has not challenged."  Id.

At least one court in this Circuit has applied Vives to shield a municipality from liability based on its enforcement of a court order issued pursuant to a state law.  Vaher v. Town of Orangetown, N.Y., 133 F. Supp. 3d 574, 605-07 (S.D.N.Y. 2015).  In Town of Orangetown, after the plaintiff's property was seized by the Orangetown Police Department ("OPD") under a warrant, the Justice Court of the Town of Orangetown issued a "Return Order" "pursuant to CPL § 690.55(1)(b) [that] directed OPD to 'retain custody of the 10 listed items seized' and 'hold the same in a safe and secure place until such time as the court, or another court of competent jurisdiction, should direct the disposition or delivery of said items.'"  Id. at 583.  OPD never returned the seized property to the plaintiff.  Id.  He in turn sought relief "on the basis of a Town policy (or decision of a high-ranking policymaker within OPD) to permanently deprive [him] of his seized property without adequate process."  Id. at 604.  In assessing the plaintiff's municipal liability claim, the district court observed that "[d]efendants were ordered to seize and retain [his] property pursuant to [CPL § 690.55(1)(b)], which authorizes courts receiving property seized pursuant to a search warrant to '[d]irect that it be held in the custody' of the government agency that applied for or executed the warrant, 'upon condition that upon order of such court such property be returned thereto or delivered to another court.'"  Id. at 606.  Because the Justice

Court's Return Order remained in place, "OPD was thus required by court order to retain custody of the seized property . . . ." Id. at 606-07. The district court added that the plaintiff failed to explain "what authority OPD could wield to deviate from state law by effecting a return of his property in contravention of a court order." Id. at 607 (citing Vives, 524 F.3d at 354-55). In turn, the district court concluded that there was "no evidence that OPD made a 'meaningful' or 'conscious' choice to erect a policy in which it would always wait for a subsequent court order before returning seized property. To the contrary, the decision was *made for* OPD through application of clear state law and obedience to an active court order." Id. The district court found that Vives precluded the municipality's liability under section 1983. Id.

Here, the state court's Sentencing and Commitment Order was issued pursuant to state law. CPL § 430.20(1) provides that "[w]hen a sentence of imprisonment is pronounced . . . the defendant must forthwith be committed to the custody of the appropriate public servant and detained until the sentence is complied with." When a state court imposes an indeterminate sentence, as this state court did for Seabrook's 2019 conviction of Criminal Possession of a Weapon in the Third Degree, CPL § 430.20(2) specifies that "commitment must be to the custody of [NYSDOCS] as provided in subdivision one of section 70.20 of the penal law . . . ." Penal Law § 70.20(1) provides that "when an indeterminate . . . sentence of imprisonment is imposed, the court shall commit the defendant to the custody of [NYSDOCS] for the term of his or her sentence and until released in accordance with the law . . . ." As required by CPL § 430.20(2) and Penal Law § 70.20(1), the state court committed Seabrook to the custody of NYSDOCS. (ECF 49-1 at 2.) CPL § 430.30 further specifies that "[i]n counties contained within New York City and in counties that have a commissioner of correction who is responsible for detention of defendants in criminal actions, it is the duty of the commissioner of correction of

such city or county to deliver the defendant forthwith to the proper institution in accordance with the commitment." The statutory scheme therefore "recognizes that physical custody of the prisoner remains for a time with the local authorities" and that they must "ultimately [be] transported . . . to a state correctional facility." Broome County v. State, 534 N.Y.S.2d 335, 337 (N.Y. Sup. 1988), aff'd, 152 A.D.2d 160 (3rd Dept. 1989); see Ayers v. Coughlin, 72 N.Y.2d 346, 349 (1988) ("Under New York's bipartite corrections system, individuals ultimately subject to State custody may initially be confined in county jails, to be transferred to State correctional facilities after conviction and sentencing."). In accordance with this, the state court's Sentencing and Commitment Order noted that Seabrook was "not presently" in NYSDOCS custody and "directed" DOC to deliver him to state custody. (ECF 49-1 at 2.)

Seabrook fails to allege that DOC and the City Commissioner Defendants had a "meaningful choice" in enforcing the Sentencing and Commitment Order. Vives, 524 F.3d at 353. Instead of effectuating Seabrook's immediate release after sentencing, the Sentencing and Commitment Order required that he initially be detained by DOC so that DOC could then transfer him to NYSDOCS custody. In taking physical custody of Seabrook at Rikers Island and attempting to transfer him to state custody during the 17-day period that he was detained, therefore, DOC was merely obeying the state court's Sentencing and Commitment Order. Seabrook does not plausibly allege that DOC or the City Commissioner Defendants had any independent authority to deviate from the state court's mandate by declining to take physical custody of him or releasing him before transfer to state custody.[6] To the contrary, as the Second

---

[6] It is of no moment that Seabrook was ultimately released from the physical custody of DOC without being transferred to a NYSDOCS facility. (See ECF 19 ¶¶ 85-86.) Pursuant to CPL § 430.20(2) and Penal Law § 70.20(1), the state court's Sentencing and Commitment Order immediately transferred "legal" custody of Seabrook to NYSDOCS. Broome County, 534 N.Y.S.2d at 337. Based on the Amended Complaint's allegations, the Court reasonably infers that DOC only released Seabrook with the "authorization" of NYSDOCS, rather than at its own discretion. (See ECF 19 ¶¶ 85-86.)

Circuit has noted, "prison officials' implementation of an inmate's sentence" is an "essentially ministerial" function that includes "arranging for transfers between various jurisdictions." Francis v. Fiacco, 942 F.3d 126, 144 (2d Cir. 2019).  Thus, in Seabrook's case, the City Commissioner Defendants did not create or enforce a policy of continuing the detention of persons who have already served their maximum sentences "independent" from or "untethered" to state law or the Sentencing and Commitment Order.  Juzumas, 33 F.4th at 688.  Rather, as in Town of Orangetown, the decision to detain Seabrook "was *made for* [DOC] through application of clear state law and obedience to an active court order."  133 F.Supp.3d at 607.

Seabrook's remaining allegations against the City Commissioner Defendants also do not give rise to a reasonable inference that they were personally involved in his alleged constitutional violations.  Beyond their claimed policymaker status, the City Commissioner Defendants' alleged roles in Seabrook's constitutional deprivations are limited to (1) their positions atop the DOC hierarchy as current Commissioner, in Maginley-Liddie's case, former Commissioners, in Molina's, Schiraldi's, and Brann's case, and current Deputy Commissioner of Security Operations, in Brererton's case, and (2) that each of them "knew of and disregarded the fact that [Seabrook] was being detained beyond his maximum sentence and [was] deliberately indifferent to the violation of his rights."  (ECF 19 ¶¶ 16-20, 110, 121, 136.)  The allegations based on the City Commissioner Defendants' positions in the DOC hierarchy are insufficient to establish personal involvement.  See Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) ("[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim.") (quoting Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985)); Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (noting that a section 1983 defendant cannot "be held personally responsible simply because he

was in a high position of authority in the prison system").  The other allegation is conclusory and

unsupported by any facts suggesting plausibly that the City Commissioner Defendants knew of

Seabrook's detainment, let alone that they were deliberately indifferent to any deprivation of his

rights.  While "[a] complaint is allowed to contain general allegations as to a defendant's

knowledge," a plaintiff is still "required to include allegations of the facts or events they claim

give rise to an inference of knowledge."  Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d

842, 864 (2d Cir. 2021).  The Amended Complaint is completely devoid of any allegations that

could give rise to such an inference.  Three of the five City Commissioner Defendants—Molina,

Schiraldi, and Brann—are former DOC Commissioners.  Because Maginley-Liddie, the current

DOC Commissioner, was sworn in on December 8, 2023, those three individuals did not hold

their positions while Seabrook was detained at Rikers Island from January 31 to February 16,

2024.[7]  Moreover, Seabrook does not allege that his lawyers directly contacted Maginley-Liddie

or Brererton, the two City Commissioner Defendants who are currently in their posts, regarding

his continued detainment, or that the recipients of his lawyers' communications, namely DOC's

Office of the General Counsel, non-defendant DOC Warden Caputo, and "numerous"

unidentified DOC officials, informed those two officials of the same.  (See ECF 19 ¶¶ 80-84.)

There is therefore no reasonable basis for the Court to infer that the City Commissioner

Defendants received notice or were otherwise aware of Seabrook's detention.

Accordingly, the Court will dismiss Seabrook's claims against the City

Commissioner Defendants for failure to adequately plead their personal involvement.

As to the remaining individual defendant, Monastero, Seabrook alleges that he

was "personally involved in the formulation and execution of the City's official policy and

---

[7] https://www.nyc.gov/site/doc/about/commissioner.page (last accessed Aug. 4, 2025).

practice of continuing the detention of persons who already have spent more time in custody prior to their sentencings than their maximum terms of imprisonment." (Id. ¶ 21.) For the reasons explained above, this allegation fails to show that Monastero was personally involved in the alleged constitutional violations. Seabrook does, however, bring additional allegations against Monastero that are distinct from those concerning the City Commissioner Defendants. Seabrook claims that in his role as a DOC Captain and the current Head of the Custody Management Unit, Monastero "is extensively involved in all day-to-day DOC custody management practices, decisions, and actions." (Id.) Seabrook also alleges that when one of his attorneys wrote to non-defendant DOC Warden Caputo on February 16, 2024—the same day that he was released—to notify him of his detention and demand his immediate release, DOC Warden Caputo copied Monastero in his response and noted that members of DOC's Custody Management Unit "had been working to 'expedite' [Seabrook's] transfer to State custody 'to no avail.'" (Id. ¶¶ 83-84.) Monastero himself responded to Seabrook's attorneys that day to inform them that "they were waiting for [NYSDOCS] to authorize [Seabrook's] release because 'we cannot neither release him nor transfer him to [NYSDOCS] custody without their authorization.'" (Id. ¶ 85.)

While Seabrook's additional allegations against Monastero plausibly suggest some personal involvement in his alleged constitutional violations, for the reasons explained below Seabrook still fails to plead "the elements of the underlying constitutional violation directly against" Monastero. Tangreti, 983 F.3d at 620. As a result, the Court will dismiss Seabrook's claims against Monastero for failure to state a claim.

Eighth Amendment

Seabrook alleges that his 17-day detainment at Rikers Island after he had already spent more time in custody than the maximum term of his indeterminate sentence violated his Eighth Amendment rights.  "A plaintiff asserting an Eighth Amendment claim pursuant to 42 U.S.C. § 1983 must meet two requirements.  First, the alleged deprivation must be, in objective terms, sufficiently serious.  Second, the charged official must act with a sufficiently culpable state of mind."  Hurd v. Fredenburgh, 984 F.3d 1075, 1084 (2d Cir. 2021) (quoting Francis, 942 F.3d at 150).  The Second Circuit has held that "unauthorized detention of just one day past an inmate's mandatory release date qualifies as a harm of constitutional magnitude under the first prong of the Eighth Amendment analysis."  Id. at 1085.  As the Second Circuit has explained, "There is no penological justification for incarceration beyond a mandatory release date because 'any deterrent and retributive purposes served by [the inmate's] time in jail were fulfilled as of that date.'"  Id. (quoting Sample v. Diecks, 885 F.2d 1099, 1108 (3d Cir. 1989)).  The second prong of the Eighth Amendment analysis "typically requires a state of mind that is the equivalent of criminal recklessness."  Id. at 1084 (quoting Francis, 942 F.3d at 150).  "This standard requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, lead to liability."  Id. (quoting Francis, 942 F.3d at 150).  "[P]rison officials can be found 'deliberately indifferent to their own clerical errors on the basis of their refusals to investigate well-founded complaints regarding these errors.'"  Id. at 1084-85 (quoting Francis, 942 F.3d at 151).

Seabrook has plausibly alleged that his 17-day detainment at Rikers Island "qualifies as a harm of constitutional magnitude under the first prong of the Eighth Amendment analysis."  Id. at 1085.  At the time that Seabrook was sentenced to an indeterminate term of 3.5

to 7 years for his 2019 conviction of Criminal Possession of a Weapon in the Third Degree, he had already served more than 7.5 years in DOC custody. Penal Law § 70.30(3) provides that the "maximum term of an indeterminate sentence imposed on a person shall be credited with and diminished by the amount of time the person spent in custody prior to the commencement of such sentence as a result of the charge that culminated in the sentence." Thus, Seabrook was entitled to "jail time" credit against his maximum sentence for the 7.5 years he spent in DOC custody prior to the date of his sentencing on January 31, 2024. Seabrook has plausibly alleged that he was entitled to immediate release by the state court on that same date, and that therefore his continued detention was a "sufficiently serious" deprivation without any "penological justification." Hurd, 984 F.3d at 1084-85.

Nonetheless, this alleged harm alone does not mean that Seabrook suffered a violation of his Eighth Amendment rights. To state an Eighth Amendment claim, he must also plausibly allege that the charged official, Monastero, acted with at least deliberate indifference to his continued detention. See id. at 1084-86. Seabrook has not done so here. To start, the Second Circuit has noted that if a charged official "could not do anything about [the plaintiff's] prolonged detention as a matter of law, then any deliberate indifference on [their] part would likely be irrelevant." Id. at 1086. That is because "[t]here must be 'a causal connection between the official's response to the problem and the infliction of the unjustified detention.'" Id. (quoting Sample, 885 F.2d at 1110). In Hurd, the Second Circuit expressed skepticism that the charged official, whom the plaintiff had failed to demonstrate had "any authority or duty" to change erroneous "jail time certifications" issued by DOC that kept the plaintiff in prison beyond his mandatory release date, could be deliberately indifferent to that resulting harm. Id. at 1082, 1086. As previously discussed, it was the state court's Sentencing and Commitment Order that

required DOC to detain Seabrook so that it could then transfer him to NYSDOCS custody. Seabrook has not demonstrated that Monastero had any independent authority or duty to prevent DOC from taking physical custody of him or to release him before transfer to state custody. Because Monastero, "could not do anything about [Seabrook's] prolonged detention as a matter of law," he could not have been deliberately indifferent to any harm suffered by Seabrook. Id. at 1086.

In any event, and despite Monastero's lack of independent authority, the Amended Complaint's allegations demonstrate that he was part of an effort inside DOC to rectify the problem, rather than that he was deliberately indifferent to Seabrook's detention. As DOC Warden Caputo wrote to Seabrook's lawyers on February 16, copying Monastero, members of the Custody Management Unit "had been working to 'expedite' [Seabrook's] transfer to State custody 'to no avail.'" (ECF 19 ¶ 84.) Because in his role as Head of the Custody Management Unit Monastero was "extensively involved in all day-to-day DOC custody management practices, decisions, and actions," it is reasonable to infer that he was involved in this attempt to hasten Seabrook's transfer. (Id. ¶ 21.) Additionally, Monastero's communication to Seabrook's lawyers informing them that "they were waiting for [NYSDOCS] to authorize [Seabrook's] release" shows that he was willing to undertake an alternative course of action to Seabrook's delayed transfer, so long as NYSDOCS gave its "authorization." (Id. ¶ 85.) Based on these facts, Seabrook has not plausibly alleged that his continued detention was brought about in any way by deliberate indifference on the part of Monastero. As the Second Circuit has made clear, "If a period of prolonged detention results from . . . processing or other administrative delays, as opposed to the deliberate indifference of prison officials, then there is no Eighth Amendment liability." Hurd, 984 F.3d at 1086. "[T]he degree to which a harm is 'unnecessary' in the sense

of being unjustified by the exigencies of prison administration will affect the state-of-mind requirement a plaintiff must meet to demonstrate that a particular official violated the eighth amendment." Id. (quoting Sample, 885 F.2d at 1109). As alleged in the Amended Complaint, Seabrook was detained at Rikers Island for 17 days largely due to "processing or other administrative delays" concerning his transfer that are inherent to "the exigencies of prison administration," not Monastero's deliberate indifference. Id. (citation omitted).

For these reasons, the Court will dismiss Seabrook's Eighth Amendment claim against Monastero.

Fourteenth Amendment

Seabrook also alleges that his detainment at Rikers Island violated his substantive and procedural due process rights under the Fourteenth Amendment. "The Fourteenth Amendment Due Process Clause prohibits states from 'depriv[ing] any person of life, liberty, or property, without due process of law.'" Matzell v. Annucci, 64 F.4th 425, 436 (2d Cir. 2023) (quoting U.S. Const. amend. XIV, § 1). "In addition to guarantee[ing] . . . fair process, . . . the Fourteenth Amendment cover[s] a substantive sphere . . . barring certain government actions regardless of the fairness of the procedures used to implement them." Id. (internal quotation marks and citations omitted). To succeed on either a substantive or procedural due process claim, a plaintiff must first establish that he enjoyed a protected liberty interest. See Hurd, 984 F.3d at 1087 ("The first step in substantive due process analysis is to identify the constitutional right at stake.") (quoting Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995)); Francis, 942 F.3d at 141 ("Federal courts 'examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State . . . .'") (quoting Kentucky Department of Corrections v. Thompson, 490 U.S.

454, 460 (1989)).  The second prong of the substantive due process analysis then requires the

plaintiff to "demonstrate that the state action was so egregious, so outrageous, that it may fairly

be said to shock the contemporary conscience," Hurd, 984 F.3d at 1087 (quoting Southerland v.

City of New York, 680 F.3d 127, 151 (2d Cir. 2012)), while that of the procedural due process

analysis "examines whether the procedures attendant upon [the] deprivation were

constitutionally sufficient."  Francis, 942 F.3d at 141 (quoting Thompson, 490 U.S. at 460).

       Seabrook's Fourteenth Amendment claims against Monastero do not implicate a

cognizable liberty interest under the Due Process Clause.  Without a doubt, "[t]he general liberty

interest in freedom from detention is perhaps the most fundamental interest that the Due Process

Clause protects."  Id.  That interest "implicates the Due Process Clause not only when a jury

convicts [a prisoner] or when a court initially sentences him, but also when prison officials

interpret and implement the sentence that the trial court has imposed."  Id. at 142.  The Second

Circuit has specifically recognized that "an inmate has a liberty interest in being released upon

the expiration of his maximum term of imprisonment."  Id. (quoting Calhoun v. New York State

Division of Parole Officers, 999 F.2d 647, 653 (2d Cir. 1993)).  As previously discussed,

Seabrook has plausibly alleged that on the date of his sentencing he was entitled to immediate

release based on the time he had already spent in DOC custody.  Thus, the state court's

Sentencing and Commitment Order, which instead committed him to the custody of NYSDOCS

and required his initial detainment by DOC, likely implicated the Due Process Clause by

depriving Seabrook of his liberty interest in freedom from detention.  Because Seabrook does not

allege that DOC or Monastero played any role in the state judge's decision to not order his

immediate release, however, the Court's inquiry is limited to whether their subsequent course of

conduct in "interpret[ing] and implement[ing] the sentence that the trial court . . . imposed" implicated Seabrook's liberty interest.  Id.  The Court concludes that it did not.

The Second Circuit's decision in Francis is instructive.  There, the court found that state prison officials' "decision to implement [the plaintiff's] sentence in a manner that diverged from the sentence pronounced by the sentencing court implicated a liberty interest of the highest order" and in turn "required them to provide certain procedural protections to safeguard [his] liberty interest in avoiding future incarceration."  Id.  In reaching this determination, the Second Circuit distinguished the plaintiff's situation from the "typical case" where "implementation of the prisoner's sentence follows straightforwardly from the sentencing court's commitment order."  Id.  Here, the Amended Complaint's allegations demonstrate that DOC and Monastero sought to implement Seabrook's sentence in a manner consistent with the Sentencing and Commitment Order.  DOC was charged with transferring Seabrook to state custody.  Accordingly, DOC detained him at Rikers Island while its officials, including Monastero, attempted to arrange his transfer.  (ECF 19 ¶¶ 82, 84, 85.)  Seabrook has not alleged that DOC or Monastero interpreted or implemented his sentence in a manner that diverged from the Sentencing and Commitment Order.[8]  Nor has he alleged that they had any authority or duty to deviate from this court order issued pursuant to state law.  That there was a delay in transferring Seabrook to state custody is largely attributable to processing or administrative issues that Monastero, among others, tried to overcome.  (Id. ¶¶ 82, 84.)  Therefore, the Court concludes that DOC's and Monastero's efforts to implement Seabrook's sentence in a manner

---

[8] As previously noted, the Court reasonably infers that DOC only released Seabrook without transferring him after receiving "authorization" to do so from NYSDOCS, (see ECF 19 ¶¶ 85-86), which had already obtained "legal" custody of Seabrook pursuant to the Sentencing and Commitment Order.  Broome County, 534 N.Y.S.2d at 337.

consistent with—indeed, required by—the Sentencing and Commitment Order did not implicate his liberty interest in freedom from detention.

Because the implementation of Seabrook's sentence did not deny Seabrook any cognizable liberty interest, the Court need not determine whether his allegations against Monastero satisfy the shock-the-conscience standard of the substantive due process analysis or whether the amount of process afforded to Seabrook was sufficient to satisfy the Fourteenth Amendment. In any event, the Court concludes the Seabrook's Fourteenth Amendment claims against Monastero also fail at the second prongs of both the substantive and procedural due process inquiries.

For Seabrook to satisfy the second prong of his substantive due process claim, "[t]he interference with the plaintiff's protected right must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." Matzell, 64 F.4th at 436 (quoting Southerland, 680 F.3d at 152). "Negligently inflicted harm will not constitute a constitutional violation, but 'conduct intended to injure in some way unjustifiable by any government interest' can satisfy the shock-the-conscience standard . . . as can, in some circumstances, conduct that 'resulted from deliberate indifference[.]'" Id. (citations omitted). Seabrook has not plausibly alleged that merely by seeking to implement his sentence in a manner consistent with the Sentencing and Commitment Order Monastero's actions rose to the level of deliberate indifference in violation of his substantive due process rights, let alone that Monastero acted with any intent to unjustifiably prolong Seabrook's detention. To the contrary, the Amended Complaint's allegations show that after Seabrook's attorneys communicated to DOC that he was being detained beyond his maximum sentence, Monastero was part of an effort to expedite his transfer to state custody and

- 22 -

willing to take an alternative course of action by releasing him from DOC custody with NYSDOCS's "authorization." (ECF 19 ¶¶ 84-85.)

As to the second prong of the procedural due process analysis, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldrige, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). "In determining 'what process is due,' . . . 'due process is flexible and calls for such procedural protections as the particular situation demands.'" Francis, 942 F.3d at 142-43 (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). To assess whether the government's procedures attendant upon a deprivation meet "that flexible standard under a given set of circumstances," the Second Circuit applies the three-step framework laid out in Mathews, which considers "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 143 (quoting Mathews, 424 U.S. at 335) (internal quotation marks omitted).

The Court assumes solely for the purposes of its procedural due process inquiry that the procedures that DOC and Monastero followed in implementing Seabrook's sentence affected his private interest in freedom from detention, which was "an interest of the highest order" and the importance of which "requires no further elaboration." Id.

Regarding the second Mathews factor, the risk of an erroneous deprivation of Seabrook's liberty under the procedures used here was virtually nonexistent. The Sentencing and Commitment Order was unambiguous in its commitment of Seabrook to the custody of

NYSDOCS and directive to DOC to deliver him to state custody. (See ECF 49-1 at 2.) In turn, the sentencing implementation procedures on display in this case, namely DOC taking physical custody of Seabrook at Rikers Island while arranging his transfer, did not involve the adoption by DOC of its own interpretation of Seabrook's sentence or any other unilateral deviation from the sentence pronounced by the state court. DOC's and Monastero's function in implementing Seabrook's sentence in a manner consistent with the Sentencing and Commitment Order was "essentially ministerial." Francis, 942 F.3d at 144. To go along with this, the probable value of additional or substitute procedural safeguards in this case is minimal. According to the transcript of Seabrook's sentencing hearing, both Seabrook's counsel and the state court recognized before Seabrook entered Rikers Island that he would be detained for administrative purposes despite having already served more than his 7-year maximum sentence. At that hearing, Seabrook's attorney stated that Seabrook "has served the entirety of his sentence" and noted that "his entry into [NYSDOCS] will be merely administrative, meaning he will go in, [NYSDOCS] will process time, and he will ultimately be released . . . It may be two days, it may be two weeks before he is processed." (ECF 53-1 at 18-19.) The state court also stated that Seabrook "is going to be released shortly" and "is going in simply for a time calculation. And we all know how that is going to come out." (Id. at 26-27.) In addition, Seabrook's attorney submitted an affirmation to the state court at the time of sentencing in which he noted that Seabrook "is currently in the custody" of DOC, "has served his entire sentence," and "[h]is entry into [NYSDOCS] is for the sole purpose of calculating all the jail time he served and should be immediately released." (ECF 49-3 ¶¶ 4, 5.) Thus, Seabrook had "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews, 424 U.S. at 333 (quoting Armstrong, 380 U.S. at 552). Prior to Seabrook's detainment by DOC, both his counsel and the state court recognized that he

would be detained beyond the maximum term of his indeterminate sentence, yet Seabrook's counsel did not lodge an objection with the state court or demand that it order Seabrook's immediate release. Once Seabrook was at Rikers Island, there would have been little value in DOC providing him with another opportunity, such as through a hearing, as Seabrook alleges, to challenge a detention that his counsel and the same court that issued the Sentencing and Commitment Order had already recognized would exceed his maximum sentence. (ECF 19 ¶ 149.) The minimal value of additional or substitute procedural safeguards under these circumstances is further underscored by Seabrook's allegations that his attorneys, whom it is reasonable to infer were on notice before he entered Rikers Island that he would be detained past his maximum sentence, were able to alert DOC officials of Seabrook's situation and that those officials, including Monastero, attempted to fix the problem within the bounds of their limited authority and did not oppose Seabrook's entitlement to release by NYSDOCS.

Turning to the third Mathews factor, the Court considers the governmental function involved here and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. As previously noted, DOC's and Monastero's function in implementing Seabrook's sentence was "essentially ministerial." Francis, 942 F.3d at 144. The ministerial nature of their function "makes the addition of extra levels of procedure particularly feasible." Id. Nonetheless, the fiscal and administrative burdens that the government would sustain as a result of additional or substitute process through which an inmate in Seabrook's situation could challenge an alleged over-detention would be high. DOC and Monastero were charged with implementing an unambiguous Sentencing and Commitment Order that on its face did not appear to contradict applicable state law. Indeed, it is reasonable to infer that in the majority of cases DOC will receive commitment orders that do not appear to be in error under

applicable law. See id. ("[W]e suspect that only a small minority of cases feature a sentencing

court directive that squarely contradicts New York law.").  Moreover, both the state court and

Seabrook's counsel recognized at his sentencing that he had already served more time than the

maximum term of his indeterminate sentence, yet the Sentencing and Commitment Order still

issued without objection.  In like cases, it would be especially burdensome, particularly

administratively, to require DOC to halt its implementation of an inmate's sentence and instead

hold a hearing or afford some other opportunity for that inmate to challenge a straightforward

directive from a sentencing court.  In effect, this would require DOC to bear the substantial

administrative burden of facilitating the re-litigation and second-guessing of many binding

sentencing court directives that, like Seabrook's, appear to be consistent with governing state law

and have not been challenged prior to the commencement of detainment.

       Having considered all three Mathews factors, the Court concludes that Seabrook's

allegations do not give rise to a plausible inference that the procedures that DOC and Monastero

followed in implementing his sentence violated his right to due process.

       For these reasons, the Court will dismiss Seabrook's Fourteenth Amendment

substantive and procedural due process claims against Monastero.

Fourth Amendment

       Seabrook further alleges that his detainment at Rikers Island constituted a seizure

in violation of the Fourth Amendment.  However, because the detainment of which Seabrook

complains followed his lawful conviction of Criminal Possession of a Weapon in the Third

Degree, the Court concludes that his claims arising from that detention must necessarily be

brought under the Eighth or Fourteenth Amendments.  See Von Stein v. Pruyne, 15-cv-7039

(CS), 2020 WL 3498431, at *12 (S.D.N.Y. June 29, 2020) ("[B]ecause the detention of which

Plaintiff complains occurred as part of the punishment stemming from his 2012 conviction for assault and his 2015 conviction for criminal possession of a controlled substance, I consider his unlawful detention claim to be brought under the Eighth Amendment, not the Fourth.") (collecting cases); A.D. v. New York State Department of Corrections and Community Supervision, 21-cv-5970 (DLC), 2022 WL 523456, at *2 (S.D.N.Y. Feb. 22, 2022) ("The Fourth Amendment regulates detention before trial . . . A.D., by contrast, challenges only the duration of his confinement after his conviction.  Such challenges can instead be brought under the Eighth Amendment.") (citation omitted); Francis v. Fiacco, 15-cv-901 (MAD/ATB), 2018 WL 1384499, at *6 (N.D.N.Y. Mar. 16, 2018), rev'd and remanded on other grounds, 942 F.3d 126 ("Having been convicted, Plaintiff's claims regarding unlawfully extending the term of his incarceration must necessarily arise either from the Eighth Amendment's prohibition of cruel and unusual punishment or the Fourteenth Amendment Due Process Clause.") (collecting cases); see also Brown v. Doe, 2 F.3d 1236, 1242 n.1 (2d Cir. 1993) ("After conviction, the Eighth Amendment serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified.") (internal quotation marks and citation omitted).  Having already disposed of Seabrook's Eighth and Fourteenth Amendment claims against Monastero, the Court will also dismiss Seabrook's claim asserted under the Fourth Amendment.[9]

Municipal Liability

As previously noted, while Seabrook did not explicitly assert a separate claim for municipal liability, the Court has interpreted the allegations in his Amended Complaint to assert a claim for municipal liability under Monell against the City of New York.  Seabrook's Monell

---

[9] Because the Court has resolved Seabrook's claims against the City Commissioner Defendants and Monastero on the merits, it need not address whether they are entitled to qualified immunity.

claim fails for two separate reasons.  First, Seabrook has not plausibly alleged that the City of New York has a policy that caused his alleged constitutional violations.  See Green v. City of Mount Vernon, 22-cv-8554 (CS), 2024 WL 710191, at *2 (S.D.N.Y. Feb. 21, 2024) ("Under *Monell* and its progeny, a municipality may be held liable where a plaintiff shows: '(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'") (quoting Torraco v. Port Authority of New York and New Jersey, 615 F.3d 129, 140 (2d Cir. 2010)).  As the Court previously explained, in taking physical custody of Seabrook and detaining him at Rikers Island while it attempted to transfer him to state custody, DOC was merely enforcing the state court's Sentencing and Commitment Order, as it was required to do.  Therefore, under Vives and its progeny, DOC did not create or act pursuant to its own policy in detaining Seabrook beyond the maximum term of his sentence.  Second, "[i]t is well-settled that a Monell claim cannot succeed without an underlying constitutional violation, and here there is no constitutional violation."  Johnson v. City of New York, 21-cv-5268 (PKC), 2022 WL 4133284, at *6 (S.D.N.Y. Sept. 12, 2022) (quoting Mastromonaco v. City of Westchester, 779 F. App'x 49, 51 (2d Cir. 2019)).  Seabrook's claims for constitutional violations on the part of the City Commissioner Defendants and Monastero are dismissed.  Accordingly, Seabrook's municipal liability claim against the City of New York will be dismissed.

CONCLUSION

   For the reasons explained above, defendants' motion to dismiss the Amended Complaint is GRANTED.  The Clerk of Court is respectfully directed to terminate the motion pending at ECF 47.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       August 4, 2025